USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/21/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

KEYLEE LAWRENCE, *Individually and on behalf of all others similarly situated, et al.,*

                                Plaintiffs,

              -against-

NYC MEDICAL PRACTICE, P.C., *d/b/a* Goals Aesthetics and Plastic Surgery, *et al.,*

                           Defendants.

------------------------------------------------------------- X

1:18-cv-8649-GHW

MEMORANDUM ORDER AND OPINION

GREGORY H. WOODS, United States District Judge:

In 2018, four employees of a New York plastic-surgery practice filed suit against their employer, alleging that it had violated various provisions of the Fair Labor Standards Act (the "FLSA") and the New York Labor Law (the "NYLL"). After a lengthy and contentious discovery period, Plaintiffs were ultimately able to certify a collective action under the FLSA and a class action under Federal Rule of Civil Procedure 23. Defendants—Plaintiffs' former employer and that employer's sole shareholder—now move for summary judgment as to Plaintiffs' claims or, in the alternative, to compel arbitration as to members of Plaintiffs' class that had previously signed arbitration agreements.

Because Plaintiffs' have met what is an admittedly low burden at this stage to advance their failure-to-pay-overtime claims to trial, but have failed to defend their remaining claims, Defendants' motion for summary judgment will be GRANTED IN PART. Additionally, because Plaintiffs cannot show that the relevant arbitration agreements are unconscionable or that they have been waived, Defendants' motion to compel arbitration will be GRANTED.

# I. BACKGROUND AND PROCEDURAL HISTORY[1]

The background facts of this case are set forth in detail in the Court's May 20, 2021 decision granting Plaintiffs' motion to certify an FLSA collective and a Rule 23 class action. *See* Dkt. No. 139 at 2–3.  As explained in that order, Plaintiffs here were employees of NYC Medical Practice P.C., which conducts business under the name GOALS Aesthetics and Plastic Surgery. *Id.* at 2.  In addition to GOALS, the other Defendant in this case is GOALS' sole shareholder, physician Sergey Voskin. *Id.*

Plaintiffs assert that while working for GOALS, they were required to work more than ten hours in a single day and more than forty hours per week.  *See* Dkt. No. 126-2 (Deposition of Keylee Lawrence, or "Lawrence Depo.") at 66:15–17 (asserting that she worked at least forty-five hours per week); Dkt. No. 126-6 (Deposition of Courtney Braccia, or "Braccia Depo.") at 32:17–21 (asserting that she worked sixty hours per week); Dkt. No. 126-4 (Declaration of Bria Warner, or "Warner Decl.") ¶ 3 (asserting that she worked at least forty-five hours per week); Dkt. No. 126-7 (Declaration of Wendy Rosado, or "Rosado Decl.") ¶ 4 (asserting that she worked at least sixty hours per week, and "often more").  Plaintiffs do not dispute that Defendants properly compensated them and similarly situated employees for at least some of that overtime work.  *See* Dkt. No. 218 ("Plaintiffs' 56.1 Response") ¶¶ 2, 12, 19, 29 (not disputing the overtime payments made to various employees).  Instead, they contend that Defendants' time records were faulty or manipulated such that Plaintiffs were never paid for all of the overtime to which they were entitled. *See* Warner Decl. ¶¶ 4–5 (stating that the timekeeping equipment often malfunctioned, that GOALS manipulated its timekeeping equipment, and that the time records never matched the weekly timesheets); Dkt. No. 126-3 (Declaration of April Bobyn, or "Bobyn Decl.") ¶ 7 (stating that

---

[1] The facts are drawn from the parties Local Rule 56.1 statements and other documents submitted in connection with the parties' cross-motions for summary judgment.  They are undisputed unless otherwise noted.

GOALS failed to accurately keep overtime records); Braccia Depo. at 35:18–36:12 (providing testimony concerning manipulation of time records).

Plaintiffs filed their active complaint in this case on September 25, 2018.  Dkt. No. 5 ("Compl.").  It includes six claims—four for alleged violations of the overtime provisions of the FLSA and the NYLL, one for alleged violations of the NYLL's spread of hours provision, and one for alleged violations of the NYLL's commission-regulating provisions.  *Id.*  The complaint also indicated that the Plaintiffs intended to certify the case as a Rule 23 class action and a collective action under the FLSA.  *Id.* at 18.

Shortly after Plaintiffs filed their compliant, GOALS instituted a policy in October 2018 pursuant to which all employees "executed an agreement with an arbitration clause including a class and collective action waiver."  Dkt. No. 162 at 2.  The text of most of those arbitration agreements reads, as relevant:

> AGREEMENT TO ARBTIRATE ANY CLAIMS.  READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY, IT LIMITS YOUR RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION.
>
> The Employer and Employee agree to arbitrate any claim, dispute, controversy, including all statutory claims and any state or federal claims, that may arise out of relate to Employee's employment with Employer including all state or federal wage payment laws. . . .  The parties also agree to:  (1) waive any right to pursue any claims arising under this agreement or related to any dispute between Employer and Employee, including statutory, state or federal claims, *as a class or collective action arbitration*; or (2) to have an arbitration under this agreement consolidated with any other arbitration or proceeding. . . .
>
> THIS ARBITRATION PROVISION LIMITS YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION.  PLEASE READ IT CAREFULLY PRIOR TO SIGNING.

Dkt. No. 208-3 § 15; Dkt. No. 208-5 § 15; Dkt. No. 208-6 § 15; Dkt. No. 208-7 § 15; Dkt. No. 208-8 § 15 (italics emphasis added for all citations).[2]

---

[2] One relevant agreement—signed by class member Cassandra Vermiul—uses slightly different language, but has the same class and collective action waiver as the other agreements.  *See* Dkt. No. 208-4 § 13.  It reads:

Because Plaintiffs elected not to pursue conditional class certification, the parties proceeded through discovery before Plaintiffs moved to certify their FLSA collective and Rule 23 class. *See* Dkt. No. 139 at 7. During that discovery period, as part a different case in front of a different court, two individuals who would later become part of the class in this case—Natasha Lubrano and Chrismary Rodriguez—entered into a court-approved settlement agreement by which they "voluntarily, irrevocably and unconditionally release[d] . . . any claims they [had], or may have, against Goals" and related entities. Dkt. No. 208 ¶¶ 5–7.

After discovery concluded and the Court granted class certification on May 20, 2021, *see* Dkt. No. 139 at 24, the parties began discussing the process by which notice of the case would be sent to putative class members. *See, e.g.*, Dkt. No. 143 (Court order concerning the notice and consent forms). On July 5, 2021, at the tail end of these discussions, Defendants raised the prospect that some potential class members may have signed arbitration agreements waiving their right to participate in any class or collective action. Dkt. No. 162 at 2. This was the first time that the existence of the arbitration agreements was made known to the Court, though Defendants contend that they notified Plaintiffs of the agreements and their possible relevance earlier in the discovery

---

AGREEMENT TO ARBITRATE ANY CLAIMS. READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY, IT LIMITS YOUR RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION.

The Parties to this Agreement agree to arbitrate any claim, dispute, controversy, including all statutory claims and any state or federal claims, that may arise out of relate to anything related to arising out of this Agreement. By agreeing to this Agreement, Employee and Company understand and agree that Employee and Company are waiving their rights to maintain other available resolution processes, such as a court action or administrate proceeding, to settle their disputes. . . . The parties also agree to: (1) waive any right to pursue any claims arising under this agreement or related to any dispute between Employee and Company, including statutory, state or federal claims, *as a class or collective action arbitration*; or (2) to have an arbitration under this agreement consolidated with any other arbitration or proceeding. . . .

THIS ARBITRATION PROVISION LIMITS YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION. PLEASE READ IT CAREFULLY PRIOR TO SIGNING.

*Id.* (italics emphasis added).

period.  *See* Dkt. No. 173 at 13:12–18.

In an October 7, 2021 oral opinion, the Court declined to limit the scope of class notice to exclude anyone who had potentially signed an arbitration agreement.  *Id.* at 17–20.  But it noted its intent to "put in place a process" to allow the Defendants to engage in motion practice concerning the arbitration agreements if they could show, after the period to join the class concluded, that one or more members of the class had signed such an agreement.  *Id.* at 18:3–4; *see also id.* at 19:19–21 (noting that Defendants could later "seek to compel arbitration and dismiss the claims of any plaintiffs with valid arbitration agreements who later join these actions").  Then, after class notices were sent and returned, the Court reopened discovery on March 16, 2022 for the limited purpose of permitting an exchange of information (and additional discovery) about the opt-in members of the collective action and which class members had entered into arbitration agreements; that discovery window closed on June 8, 2022.  Dkt. No. 189.

About a month-and-a-half after that discovery period concluded, Defendants filed a letter on July 20, 2022 requesting to file three motions:  a motion for summary judgment, a motion to compel arbitration as to class members who had entered into arbitration agreements, and a motion to decertify the class.  Dkt. No. 197.  After an August 9, 2022 conference, the Court granted Defendants' request in part, permitting them to file their motions for summary judgment and to compel arbitration (but not the proposed motion to decertify).  Dkt. No. 203.  Defendants filed both motions on October 11, 2022, and filed a related motion to seal the next day.  *See* Dkt. No. 206 (motion to compel arbitration); Dkt. No. 207 (memorandum of law in support, or "Defs' Arb. Mem."); Dkt. No. 209 (motion for summary judgment); Dkt. No. 210 (memorandum of law in support, or "Defs' MSJ Mem."); Dkt. No. 215 (motion to seal).  Plaintiffs responded to the motions for summary judgment and to compel arbitration on November 10, 2022.  *See* Dkt. No. 216 (Plaintiffs' memorandum of law opposing the arbitration motion, or "Pls' Arb. Opp."); Dkt. No.

217 (Plaintiffs' memorandum of law opposing the summary-judgment motion, or "Pls' MSJ Opp.").

And Defendants replied in support of both motions on November 25, 2022. *See* Dkt. No. 219

(Defendants' reply in support of the arbitration motion, or "Arb. Reply"); Dkt. No. 220

(Defendants' reply in support of the summary-judgment motion, or "MSJ Reply").

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A

genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence

sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant

"must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

*Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted),

and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed.*

*Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

    In determining whether there exists a genuine dispute as to a material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)

(quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is not to "weigh the

evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)

(citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying

th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of

witnesses.").  "Assessments of credibility and choices between conflicting versions of the events are

matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citation omitted).

### B.  Motion to Compel Arbitration

    The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract."  9 U.S.C. § 2.  The FAA provides the following:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate
> under a written agreement for arbitration may petition any United States district
> court which, save for such agreement, would have jurisdiction under Title 28, in a
> civil action or in admiralty of the subject matter of a suit arising out of the
> controversy between the parties, for an order directing that such arbitration proceed
> in the manner provided for in such agreement.

9 U.S.C. § 4.

    It is well settled that "arbitration is a matter of contract, and that parties cannot be

compelled to arbitrate issues that they have not specifically agreed to submit to arbitration." *Shaw*

*Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 567 (S.D.N.Y. 2013) ("It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate."). If the Court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must . . . order the parties to arbitrate." *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

"The question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties." *Id.* (quotation and brackets omitted); *see also AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract") (quotation omitted).

In evaluating a motion to compel arbitration, courts "apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia*, 834 F.3d at 229). This means the Court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotations omitted). "[T]he Court must grant a motion to compel arbitration if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Gabay v. Roadway Movers, Inc.*, --- F. Supp. 3d. ---, 2023 WL 3144310, *3 (S.D.N.Y. Apr. 28, 2023) (quoting *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559,

561–62 (S.D.N.Y. 2013)); *see also Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 317 (S.D.N.Y. 2016) (Nathan, J.) (same).

> Courts in this Circuit engage in the following inquiry:
>
> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).  The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010); *see also Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.").

As with other contractual rights, the right to compel arbitration may be waived. *See Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1713 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").  "'[W]hen the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver.'" *Alvarez v. Experian Info. Sols., Inc.*, --- F. Supp. 3d ----, No. 19-cv-03343, 2023 WL 2519249 at *7 (E.D.N.Y. Mar. 15, 2023) (quoting *S&R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 82–83 (2d Cir. 1998)).

## III. DISCUSSION

### A. Motion for Summary Judgment

Defendants have moved for summary judgment as to all of Plaintiffs' claims.  *See* Defs' MSJ Mem. at 2.  Because Plaintiffs have provided enough evidence to maintain their overtime claims under the lenient standards that apply to those claims at this stage, Defendants' motion for summary

judgment will be denied as to Plaintiffs' first four causes of action.  But because Plaintiffs have abandoned their spread-of-hours and commission claims, Defendants' motion will be granted as to Plaintiffs' fifth and sixth causes of action.

### 1.  Overtime Claims

Plaintiffs' first four claims all allege that Defendants failed to properly compensate Plaintiffs for hours worked in excess of forty hours per week, thereby violating the FLSA and the NYLL.  *See* Compl. ¶¶ 89–118.  Because Plaintiffs have submitted sufficient evidence to establish relevant disputes of material fact as to whether Defendants knew or should have known that Plaintiffs performed uncompensated work in excess of forty-hours-per-week under the lenient summary-judgment framework established by Second Circuit precedent, Defendants' motion for summary judgment will be denied as to Plaintiffs' overtime claims.

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Keubel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)).[3]  "[A]t summary judgment, if an employer's [payment] records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference'" in order for the overtime claim to go to trial.  *Id.* at 362 (quoting *Anderson*, 328 U.S. at 687).  And this rule applies not only where the employer's records are facially inadequate, but also where there is evidence sufficient to create a material dispute of fact that facially accurate records are, because of actions taken by the employer, in fact erroneous.  *See id.* at

---

[3] "A similar standard applies to unpaid compensation claims under [the] NYLL" that is different only insofar as it is more plaintiff-friendly when a plaintiff moves for summary judgment.  *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 253 (S.D.N.Y. 2021) (quoting *Gonzalez v. Masters Health Food Serv. Inc.*, No. 14-cv-7603, 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017)).

363 ("[W]e hold that because [the plaintiff] has presented evidence indicating that his employer's records are inaccurate—and that although it was he who purposefully rendered them inaccurate, he did so at his managers' direction—the district court should have afforded [the plaintiff] the benefit of *Anderson's* 'just and reasonable inference' standard."); *see also, e.g.*, *Aponte v. Mod. Furniture Mfg. Co., LLC*, No. 14-cv-4813, 2016 WL 5372799, at *11 (E.D.N.Y. Sept. 26, 2016) (holding that because "the Plaintiffs offer[ed] testimony suggesting that the [employer's] records are not accurate or complete," the "just and reasonable inference standard" was appropriate).

Plaintiffs are entitled to the "just and reasonable inference" standard articulated by *Keubel* and *Anderson*. This is not a case where Defendants' employment records are facially inadequate. *See, e.g.*, Defs' MSJ Mem. at 14–15 (discussing records produced during discovery of paid wages and overtime). But Plaintiffs have provided admissible evidence to support their allegations that these time records are in fact inaccurate because Defendants modified or tampered with them. *See* Warner Decl. ¶ 5 ("I have personal knowledge that GOALS maintained false time records, which understated the true number of hours worked each week. GOALS manipulated and modified its ADP time keeping equipment to minimize and understate the true number of hours worked each week by receptionists. The ADP time records never matched the weekly timesheets."); *id.* ¶ 4 ("The ADP time keeping equipment in the Harlem office was frequently inoperable and/or had erroneous time settings. For those reasons, I did not routinely utilize this time recording equipment and instead, was instructed by GOALS to generate my own manual weekly timesheets, which I submitted to HR at the end of every week."); Bobyn Decl. ¶ 7 ("I had [as an HR employee] personal information and knowledge about [GOALS's] corporate overtime policy. GOALS failed to keep full and accurate records of hours and wages for receptionists and patient care coordinators."); Braccia Depo. at 35:18–36:12 ("Q. As for each morning that you clocked in beginning in March, do you have any reason to believe that this system did not accurately keep track of the time that you

11

clocked in?  A.  Yes, I do.  Q.  What is your basis for that?  A.  My basis for that is there were several

people that would go in and edit the times.  Q.  Who?  A.  Nikki Bates, as requested by Ella, went in

and did it; Alexa, I don't know her last name, has done it; and there were a few girls I was not

familiar with at that time that had gone in and done it.  Q.  How would they go in and edit the time?

A.  I don't know exactly how they do it; but given the order, they would go in and do it.").  Because

this evidence is sufficient to raise disputes of material fact about the accuracy of Defendants'

records, Plaintiffs' claims can survive summary judgment if they can present "sufficient evidence to

show the amount and extent of [the uncompensated work] as a matter of just and reasonable

inference." *Keubel*, 643 F.3d at 362 (quoting *Anderson*, 328 U.S. at 687).

    Plaintiffs have cleared this admittedly low bar.  "It is well settled among the district courts of

this Circuit, and [the Second Circuit] agree[s], that it is possible for a plaintiff to meet" the burden of

showing the amount of uncompensated work as a matter of just and reasonable inference "through

estimates based on his own recollection." *Id.*  Many of the Plaintiffs in this case have stated how

many hours they worked each week, and some have given additional details about their work

schedule and allegedly unpaid overtime.  Lawrence Depo. at 66:15–17 ("Q. On average, how many

hours would you work each [week]?  A. At least 45 hours a week.");  Braccia Depo. at 32:17–21 ("Q.

Please explain to me what it is that you claim you were not paid in overtime.  A.  I was scheduled for

forty hours a week, but it was never forty hours a week.  It was sixty hours.");  Warner Decl. ¶ 3 ("I

worked at least forty-five [45] hours per week.  I worked through lunch break at least 3 days per

week.  I worked 2-3 days per week for 10+ hours.");  Rosado Decl. ¶ 4 ("I worked at least sixty [60]

hours per week, and often more.  I was in the office at least 8 hours per day, five [5] days per week,

but often six [6].").[4]  This is information that a reasonable jury could find "show[s] the amount and

---

[4] Three of the FLSA named Plaintiffs here—Summer Robbins, Elizabeth Vargas, and Richard Soto—have not provided
evidence about the amount of overtime that they worked.  For the reasons explained below in Part III(B), Vargas's
claims in this case will be stayed pending arbitration, rendering the summary-judgment motion moot as to her.  As for

extent of [the uncompensated work] as a matter of just and reasonable inference." *Keubel*, 643 F.3d at 362 (quoting *Anderson*, 328 U.S. at 687); *see, e.g.*, *Sherald v. Embrach Techs., Inc.*, No. 11-cv-939, 2013 WL 126355, at *6 (S.D.N.Y. Jan. 10, 2013) (finding that while a plaintiff's testimony claiming "that he was not paid for 1) thirty minutes of pre-shift work on the majority of days he was employed; 2) various lunchtime meetings occupying the entire lunch hour that allegedly occurred about ten times per year; and 3) interruptions in his lunch from calls of variable duration" did "not conclusively establish the amount of unpaid work potentially compensable as damages, it at least provide[d] a reasonable basis for such a determination by the fact finder," and that his FLSA claim could proceed to trial); *Azkour v. Little Rest Twelve, Inc.*, No. 10-cv-4132, 2012 WL 402049, at *5 (S.D.N.Y. Feb. 7, 2012) (finding that a plaintiff's statement that "he recall[ed] working in excess of 40 hours per workweek regularly, and often working as many as 50 or 60 hours per week" was sufficient for the plaintiff's claim to survive summary judgment), *report & recommendation adopted*, 2012 WL 1026730 (S.D.N.Y. Mar. 27, 2012).  As a result, Plaintiffs have met their burden to show their damages as a matter of just and reasonable inference.

That is all Plaintiffs need to do to survive summary judgment.  Defendants argue that "[o]nce the Plaintiff meets [the] burden" of showing damages as a matter of just and reasonable inference, the burden "shifts back to the employer, who should 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'"  Defs' MSJ Mem. at 11 (quoting *Keubel*, 643 F.3d at 362).  But that argument reflects a misreading of *Keubel* and a misunderstanding of the difference between the applicable legal test at summary judgment and trial.  The relied-upon quote from *Keubel*

---

Robbins and Soto, Defendants do not argue that summary judgment should be granted as to these individuals specifically.  At trial, to be sure, these Plaintiffs will either need to "testify" or rely on evidence provided by the other Plaintiffs "sufficient . . . for the jury to make a reasonable inference as to the number of hours worked by the non-testifying employees."  *Grochowski v. Phoenix Const.*, 318 F.3d 80, 88 (2d Cir. 2003).  But summary judgment is not warranted now.

about the employer's burden to come forward with evidence negating an employee's evidence is itself quoting *Anderson*, which was describing an employer's burden when facing judgment *at trial*. *See Anderson*, 328 U.S. at 684, 688–89 (noting that the case had been referred to a special master for a final decision after hearing testimony and making findings, and that if the employer failed to negate the employee's evidence "the court may then award damages to the employee"). But after quoting that language from *Anderson*, the *Keubel* court clarified how it applied in the context of summary judgment: "at summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference.'" *Keubel*, 643 F.3d at 362 (quoting *Anderson*, 328 U.S. at 687) (alteration in *Keubel*).

The rest of *Keubel*, moreover, makes clear that it would be error to impose any burden on Plaintiffs additional to showing their damages as a matter of just and reasonable inference. *See id.* at 363 ("[W]e hold that because Kuebel has presented evidence indicating that his employer's records are inaccurate—and that although it was he who purposefully rendered them inaccurate, he did so at his managers' direction—the district court should have afforded Kuebel the benefit of *Anderson's* 'just and reasonable inference' standard."); *id.* at 365 (noting that the defendant's evidence purportedly negating the plaintiff's contentions "raise[d] factual and credibility questions for trial" but did not "afford a basis for summary judgment" for the defendant because the plaintiff had provided admissible evidence questioning the accuracy of the time records). Applying *Keubel* here, Plaintiffs have established their entitlement to the "just and reasonable inference" standard by providing admissible evidence about the faultiness of Defendants' time records, and have satisfied that standard by supplying sufficient evidence of the amount of unpaid overtime that they are claiming.[5] That is sufficient to bring their overtime claims to trial, so long as Plaintiffs have also

---

[5] Because rejecting Defendants' core argument about burden-shifting is sufficient to show that Plaintiffs' have met their

provided sufficient evidence to support a finding "that the employer had actual or constructive knowledge of that [uncompensated] work." *Keubel*, 643 F.3d at 361.

Plaintiffs—as Defendants do not contest—have met this burden too. In order to meet *Keubel's* knowledge requirement, Plaintiffs need only "raise[ ] a genuine issue of material fact as to whether [Defendants'] knew [they were] working off the clock." *Id.* at 365. They have done so. For instance, Ms. Bobyn states in her declaration that she "received persistent and continuous complaints from . . . employees that they were being shorted on wages and overtime compensation, i.e. the wages they received from GOALS was always less than the actual hours worked each week." Bobyn Decl. ¶ 7; *see also* Dkt. No. 214 Ex. M (deposition of April Bobyn, or "Bobyn Depo.") at 75:5–10 (specifically stating that she received complaints from people in this lawsuit). And Ms. Lawrence stated in her deposition that she raised the issue her paycheck not "accurately reflect[ing] the hours that [she] had worked" to someone at GOALS (though she did not remember who). Lawrence Depo. at 49:22–50:10. This is sufficient evidence from which a jury could find that Defendants had at least constructive knowledge of Plaintiffs' off-the-clock hours. *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998) (noting that knowledge includes any reason that the employer "has reason to believe that [extra] work is being performed" (quoting 29 C.F.R. § 785.12 (1997)); 29 C.F.R. § 785.13 ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them."); *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (noting the employer's "duty . . . to inquire into the conditions prevailing in his business").

In sum, Plaintiffs have provided evidence that—if credited—a reasonable jury could use to

---

burden at this stage, the Court does not linger on Defendants' subsequent contentions about the burden being "passed back" to Plaintiffs, or the showing that Plaintiffs would be required to make if this burden existed, both of which flow from the same fundamental misreading of *Keubel*. *See* Defs' MSJ Mem. at 9–17.

calculate their alleged uncompensated overtime work as a matter of just and reasonable inference. And a reasonable jury could also view Plaintiffs' evidence as sufficient to show that Defendants had actual or constructive knowledge of that uncompensated overtime. As a result, Defendants' motion for summary judgment is denied as to Plaintiffs' overtime claims.

### 2. Spread-of-Hours and Commission Claims

Defendants' motion for summary judgment will be granted as to Plaintiffs' fifth and sixth causes of action. These claims allege spread-of-hours (claim five) and failure to pay commission (claim six) violations under the NYLL. Compl. ¶¶ 119–136. Defendants clearly and specifically moved for summary judgment on these claims. *See* Defs' MSJ Mem. at 22–26. And in their briefing, Plaintiffs failed to oppose this aspect of Defendants' motion. *See generally* Pls' MSJ Opp. As a result, the court deems these claims abandoned, and Defendants' motion for summary judgment is granted as to them. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[W]hen a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'" (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014))).

### B. Motion to Compel Arbitration

Because the parties to this case entered a valid agreement to arbitrate and Defendants have not waived their right to compel arbitration, Defendants' motion to compel arbitration as to six members of Plaintiffs' class—Ariana Rivera, Cassandra Vermiul, Veronica Santiago, Kailyn Bayron, Charlene Jackson, and Elizabeth Vargas—will be granted.[6] "Arbitration is contractual by nature—'a

---

[6] In their arbitration motion, Defendants also moved to dismiss two individuals—Natasha Lubrano and Chrismary Rodriguez—from the class because they have previously settled all disputes in a prior case. *See* Defs' Arb. Mem. at 4; *see also* Dkt. No. 208 ¶¶ 5–7 (outlining the terms of the prior settlement agreements) Plaintiffs have not opposed this aspect of Defendants' motion. *See generally* Pls' Arb. Opp. As a result, the Court grants this aspect of Defendants' motion and these individuals must be excluded from Plaintiffs' class. *See Kovaco*, 834 F.3d at 143 (noting that a failure to respond to aspects of an opposing party's briefing represents an abandonment of the issue).

party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Here, however, there is no dispute that these individuals signed arbitration agreements that precluded later participation in any class or collective action.  *See generally* Pls' Arb. Opp.; *see also* Dkt. No. 208 Exs. 3–8 (arbitration agreements for these individuals).  Instead, Plaintiffs argue that the arbitration agreements are unconscionable or, alternatively, that Defendants have waived their right to enforce them by participating in this litigation.  As neither argument is supported by applicable precedent, the arbitration agreements will be enforced.

### 1. Unconscionability

Plaintiffs have failed to demonstrate that the arbitration agreements at issue are unconscionable and thus unenforceable.  Under Federal Rule of Civil Procedure 23, courts have authority to "make orders to manage class action communications." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 268 (S.D.N.Y. 2020).  That authority permits the court to ensure that neither the process of forming an arbitration agreement nor the arbitration agreement itself impermissibly "threaten[s] the 'choice of remedies' available to putative [class action] plaintiffs." *OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 601 (S.D.N.Y. 2020) (quoting *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 922 (11th Cir. 2014)).

Because "arbitration is a matter of contract," *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011), courts "'apply ordinary state-law principles that govern the formation of contracts' to contractual defenses such as unconscionability." *OConner*, 444 F. Supp. 3d at 602 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  Once evidence has been submitted demonstrating that an arbitration agreement has been signed, "the party challenging the enforceability of [that] arbitration agreement has the burden of showing grounds for its revocation"

such as "fraud, unconscionability, or some other defect." *Schreiber v. K-Sea Transp. Corp.*, 9 N.Y.3d 331, 340 (2007).  And "[u]nder New York law, a contract provision may be deemed unenforceable on unconscionability grounds 'only where it is both procedurally and substantively unconscionable when made.'" *Chen-Oster*, 449 F. Supp. 3d at 247 (quoting *Spinelli v. National Football League*, 903 F.3d 185, 208 (2d Cir. 2018)).

Plaintiffs argue that the arbitration agreements should be deemed unconscionable and unenforceable because they were signed after litigation in this case began but did not specifically mention the litigation.  Pls' Arb. Opp. at 9–10.  As an initial matter, this argument does not apply to the arbitration agreement signed by Cassandra Vermiul as part of her separation from GOALS; that agreement was signed on April 12, 2018, months before this case began.  *See* Dkt. No. 208 Ex. 4. Because Plaintiffs suggest no other reason why that agreement could be unconscionable, the Court holds that it is not.  Nor have the Plaintiffs shown that the other five arbitration agreements that were signed after this litigation began are unconscionable.

### i.  Procedural Unconscionability

The agreements were not procedurally unconscionable.  "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice.  The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."  *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10–11 (1988).

Both of Plaintiffs' contentions map onto the second *Gillman* factor:  "whether deceptive or high-pressured tactics were employed."  73 N.Y.2d at 11.  First, Plaintiffs argue for a *per se* rule that "[a]rbitration agreements signed after litigation is commenced are deemed unconscionable and thus

unenforceable." Pls' Opp. at 9 (quoting *Weinstein vs. Jenny Craig Ops. Inc.*, 2014 WL 10680367, at *2 (Sup. Ct. N.Y. Sept. 8, 2014)). And second, Plaintiffs contend that the agreements are unconscionable because they "contained a complete omission of the existence of this action." *Id.* at 9; *see* Dkt. No. 208 Exs. 3, 5–8 (the arbitration agreements, which did not discuss this case). But the fact that the arbitration agreements were signed after this litigation began and did not call out the existence of this case is insufficient to show that this *Gillman* factor cuts in favor of unconscionability—let alone that the agreements are procedurally unconscionable when weighing all of the *Gillman* factors.

Starting with Plaintiffs' first argument, the majority rule is that arbitration agreements may be unconscionable where a defendant not only "implement[s] a new arbitration policy shortly after filing of the litigation," but also "purposefully target[s] putative class members with that policy." *Chen-Oster*, 449 F. Supp. 3d at 266 (collecting cases). It is true that here, GOALS rolled out its arbitration policy shortly after the initiation of this lawsuit. *See* Dkt. No. 208 ¶ 13 (noting that the arbitration forms were signed by employees of the Defendants starting in October 2018). But aside from that timing, there is no other evidence that Defendants were purposefully targeting *this* litigation through their new arbitration policy. *Compare, e.g.*, *Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1059 (W.D. Wash. Nov. 19, 2019) (enjoining the use of a class waiver that explicitly cut out plaintiffs' ability to participate in certain lawsuits). And there is at least some evidence that suggests to the contrary; the relative lack of speed at which the agreements were signed, for instance, contrasts with other cases in which purposeful targeting of a specific class has been found. *Compare, e.g.*, *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014) (finding that the arbitration agreements were "a hurried reaction specifically targeted at curtailing this litigation" because they were "rolled out . . . in a blitzkrieg fashion" quickly after a lawsuit's filing), *with* Dkt. No. 208 Exs. 3, 5–8 (the arbitration agreements in this case, which were signed at various points in 2019 and 2020).

As a result, even if the timing of the arbitration agreements raises an inference that class members in this lawsuit were purposefully targeted, any such inference is significantly diminished by the lack of other evidence that the arbitration agreements were designed to prevent this case.  Just as plausible—and perhaps more plausible—of an inference is that Defendants, having been taken to federal court, instituted the arbitration policy in order to avoid *future* litigation.

As for Plaintiffs' second argument about the arbitration agreements' failure to mention this case, it is true that "[c]ourts are indeed more likely to take remedial action when the defendant presenting an arbitration agreement or release does not call attention or provide sufficient information about the class or collective action." *Chen-Oster*, 449 F. Supp. 3d at 268; *see also OConnor*, 444 F. Supp. 3d at 602 ("A court may find unconscionability where a non-drafting party has no way of knowing a material fact." (quoting *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005))).  But here again, Plaintiffs have misstated a presumption as a hard-and-fast rule; as *Chen-Oster* itself noted, courts assessing arbitration agreements—in accordance with the unconscionability standard—should "[examine] the entirety of defendant's conduct and communications [and there is no] statutory rule or case law that requires defense counsel to give specific information and instructions to putative class members, nor [are there] any 'magic words' that must be disclosed [in communications]." *Id.* (quoting *Bobryk v. Durand Glass Manufacturing Co., Inc.*, No. 12-cv-5360, 2013 WL 5574504, at *6 (D.N.J. Oct. 9, 2013)) (alterations in *Chen-Oster*).

Here, as in *Chen-Oster*, even if the relevant omission is of "some concern," it is significantly "tempered by the lack of supporting evidence in the record" that any individual Plaintiff ever "was, or even felt misled by the agreements." *Id.* at 269–70.  It is also tempered by the lack of other evidence of "deceptive or high-pressure tactics" used to ensure signature of the agreements. *Gillman*, 73 N.Y.2d at 11.  In *OConnor*, for instance, deception existed where managers were instructed not to tell employees that signing the arbitration agreement was a condition of

employment, higher-ups exchanged emails about getting around "'any resistance' to signing the arbitration agreements," and employees were pressured to sign agreements more quickly than they were comfortable with.  444 F. Supp. 3d at 599–601.  And in a recent Fourth Circuit case, high-pressure tactics supporting the unconscionability of arbitration agreements included forced meetings between the plaintiffs and the defendant's chief financial officer or counsel, and false statements from those individuals about the consequences of the failure to sign an agreement.  *See Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 144 (4th Cir. 2018).  Here, by contrast, there are no facts in the record to suggest that any such tactics were used, and Plaintiffs have made no argument and presented no evidence about pressure used to induce signature of the agreements.  As a result, they have not shown that the arbitration agreements were procured through such deceptive or high-pressure means that they should be disregarded.

The other *Gillman* factors, moreover, reinforce the conclusion that the agreements were not procedurally unconscionable when signed.  As an initial matter, Plaintiffs provide no evidence (and make no argument) about the "size and commercial setting of the transaction" or "experience and education of the party claiming unconscionability."  *Gillman*, 73 N.Y.2d at 11.  Nor do they make any argument about disparity of bargaining power.  While it is true that "employees may be subject to employer coercion" such that there is nearly always something of "disparity in bargaining power as between . . . employees and their employer, *Chen-Oster*, 449 F. Supp. 3d at 265, that fact alone is insufficient to invalidate arbitration agreements.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 (1991) ("Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.").  Absent any specific facts tying the relative power in the employer-employee relationship to the signing of these agreements, this factor also does not support finding the agreements procedurally unconscionable.  *See also Chen-Oster*, 449 F. Supp. 3d at 265–66 (collecting cases noting that the mere fact that an

arbitration agreement was signed as part of an employment relationship does not require invalidation of the agreement).

The final factor—the "use of fine print"—cuts strongly against finding procedural unconscionability. *Gillman*, 73 N.Y.2d at 11. That is because the agreements informed the relevant Plaintiffs that they should "READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY" because "IT LIMITS [THEIR] RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION." *See* Defs' Arb. Mem. at 2. That clear, all-caps language significantly militates against finding the agreements to be procedurally unconscionable. *See, e.g.*, *Carr v. Credit One Bank*, No. 15-cv-6663, 2015 WL 9077314, at \*3 (S.D.N.Y. Dec. 16, 2015) ("This arbitration clause was clear, conspicuous, and preceded by a heading written in all capital letters and bold print . . . . Accordingly, plaintiff's unconscionability argument is rejected."); *Reeves v. Safeguard Props. Mgmt., LLC*, No. 19-cv-10210, 2021 WL 2403538, at \*5 (S.D.N.Y. June 10, 2021) (approving of an arbitration agreement that was not in fine print); *Keller v. About, Inc.*, No. 21-cv-228, 2021 WL 1783522, at \*2 (S.D.N.Y. May 5, 2021) (same).

At bottom, Plaintiffs have failed to provide sufficient contextual facts to demonstrate procedural unconscionability; to the contrary, the available facts weigh against such a finding. Because an "examination of the contract formation process" under the factors used by New York state courts thus does not demonstrate a "lack of meaningful choice" in signing the relevant arbitration agreements, they will not be deemed procedurally unconscionable. *Gillman*, 73 N.Y.2d at 10.

### ii.   Substantive Unconscionability

Because the arbitration agreements were not procedurally unconscionable, they are enforceable. *See Spinelli*, 903 F.3d at 208 (noting that a contract must be *both* procedurally and substantively unconscionable to be unenforceable under New York law). But even if that were not

the case, they would still be enforceable because they are not substantively unconscionable.  Unlike procedural unconscionability, substantive unconscionability looks not to the contract's formation but "to the content of the contract."  *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (2d Dep't 1983).  A substantively unconscionable contract is one that is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms."  *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Gillman*, 73 N.Y.2d at 10).

Arbitration agreements that waive the right to participate in class action proceedings (as the agreements in this case do) are not *per se* unconscionable.  *See Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S. 478, 480 (1st Dep't 2004) ("Under New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy.'" (quoting *Ranieri v. Bell Atl. Mobile*, 759 N.Y.S. 2d 448, 449 (1st Dep't 2003))); *see also Horton v. Dow Jones & Co., Inc.*, 804 F. App'x 81, 84 (2d Cir. 2020) (summary order) (recognizing this principle of New York law).  Plaintiffs have not pointed the Court to any other provision of the arbitration agreements at issue here to suggest substantive unconscionability.  And having reviewed the agreements, the Court does not discern any particularly unusual provision, let alone one "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable."  *Ragone*, 595 F.3d at 121.  As a result, the agreements are neither procedurally nor substantively unconscionable, and will not be set aside on that basis.

### 2.  Waiver of the Right to Compel Arbitration

Defendants have not waived their right to compel Plaintiffs to arbitrate their claims.  As this Court has previously discussed, *see Herrera v. Manna 2nd Avenue LLC*, No. 1:20-cv-11026, 2022 WL 2819072, at *6–8 (S.D.N.Y. Jul. 18, 2022), the Second Circuit's test for waiver of an arbitration agreement is somewhat in flux.  Prior to May 23, 2022, courts considered three factors "in

23

determining whether a party has waived its right to arbitration by expressing its intent to litigate the dispute in question . . . (1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (citations omitted). And "[t]he key to [that] waiver analysis [was] prejudice." *Id.* (quoting *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 105 (2d Cir. 2002)). As a result, courts unequivocally held that "[w]aiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated." *Id.* (internal citation and quotation marks omitted).

However, in *Morgan v. Sundance, Inc.*, the Supreme Court determined that the Eighth Circuit was wrong to "condition a waiver of the right to arbitration on a showing of prejudice" because "the FAA's policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules," and "[o]utside the arbitration context, a federal court assessing waiver does not generally ask about prejudice." 142 S. Ct. 1708, 1712–13 (2022). The Court reasoned that "court[s] must hold a party to its arbitration contract just as the court would to any other kind" and that courts "may not devise novel rules to favor arbitration over litigation." *Id.* Thus, "[i]f an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it"—but arbitration-specific waiver rules are verboten. *Id.*

In its directions to the Eighth Circuit on remand, however, the Supreme Court framed its holding slightly differently: it instructed the Eighth Circuit to "strip" its test "of its prejudice requirement" and ask, "[d]id [the defendant], as the rest of the Eighth Circuit's test asks, knowingly relinquish the right to arbitrate by acting inconsistently with that right?" *Id.* at 1714. That language suggested that the Eighth Circuit should merely strip analysis of prejudice from its existing test for

waiver of the right to arbitrate, rather than apply that Circuit's standard test for evaluating waiver in cases not involving arbitration agreements.

In *Herrera*, this Court noted that the difference between the Supreme Court's direction to the Eighth Circuit "to adopt a general waiver analysis" and its later instruction to "merely strip analysis of prejudice from [the Eight Circuit's] existing test for waiver of the right to arbitrate" creates two possible post-*Morgan* arbitration waiver tests in this Circuit.  2022 WL 2819072, at *7–8.  That is because the Second Circuit's general test for contractual waiver states that "[a] contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned.'"  *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006)).   By contrast, the Circuit's test for waiver of the right to arbitrate, when stripped of its prejudice requirement, would require Courts to consider "(1) the time elapsed from when litigation was commenced until the request for arbitration; and (2) the amount of litigation to date, including motion practice and discovery."  *La. Stadium*, 626 F.3d at 159.

Given this uncertainty, in *Herrera*, this Court conducted the waiver analysis under both possible post-*Morgan* Second Circuit tests.  *See* 2022 WL 2819072, at *8–11.  And since *Herrera*, the Circuit has not definitively clarified whether the proper post-*Morgan* test is the previous arbitration-waiver analysis stripped of the prejudice requirement or the contractual test for waiver.  *Cf. Nicosia v. Amazon.com, Inc.*, No. 21-cv-2624, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (summary order) (reaffirming, after *Morgan*, a prior finding made before *Morgan* that a party had not waived its right to arbitrate because the prior order did not rely solely on prejudice in making the waiver determination).  As a result, district courts in the Second Circuit have adopted a variety of approaches to conducting the arbitration-wavier analysis.  *See, e.g.*, *Alvarez*, 2023 WL 2519249, at *9 (interpreting *Nicosia* to support a continued "rel[iance] on the first two factors of its waiver test" and

therefore applying "the two-factor test along with general contractual waiver principles in mind");
*Deng v. Frequency Elecs. Inc.*, No. 21-cv-6081, 2022 WL 16923999, at *6 (E.D.N.Y. Nov. 14, 2022)
(reasoning that "applying waiver to an arbitration agreement should be the same as applying waiver
in the context of any other contract" and applying the general contractual waiver test); *De Jesus v.
Gregorys Coffee Mgmt., LLC*, No. 20-cv-6305, 2022 WL 3097883, at *7 (applying the two-factor
Second Circuit test); *Flores v. Nat'l Football League*, No. 22-cv-0971, 2023 WL 2301575, at *8
(S.D.N.Y. Mar. 1, 2023) (applying both the contractual waiver analysis and the two-factor test).

Although at some point "courts may be forced to interpret whether *Morgan* instructs courts
to adopt general waiver analysis, or instead instructs courts to strip any prejudice requirement from
their existing analysis of waivers of the right to arbitration under the FAA," there is no need to do
so today. *Herrera*, 2022 WL 2819072, at *8. That is because, as in *Herrera*, Defendants have not
waived their right to arbitrate under either test.[7]

### i. Contractual Waiver Analysis

Under New York contract law, waiver requires "a clear manifestation of an intent . . . to
relinquish [a] known right." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d
573, 585 (2d Cir. 2006) (internal quotation marks and citation omitted). "Waiver may be established
by affirmative conduct or by a failure to act that evinces the intent to abandon the right." *Coggins v.
Cnty. of Nassau*, 615 F. Supp. 2d 11, 30 (E.D.N.Y. 2009). "But 'waiver should not be lightly
presumed and must be based on a clear manifestation of intent to relinquish a contractual

---

[7] Although unaddressed by both parties in briefings, the arbitration agreements at issue contained a "no waiver clause"
that reads: "The failure of the Employer to enforce any term, provision, or condition of This Agreement at any time or
times shall not be deemed a waiver of that term, provision, or condition for the future, nor shall any specific waiver of a
term, provision, or condition at one time be deemed a waiver of such term, provision, or condition for any future time
or times." Dkt. No. 208 Exs. 3, 5–8 § XVII. But "[a] so-called 'no-waiver' clause may itself be impliedly waived under
certain circumstances." *Luitpold Pharms.*, 784 F.3d at 95 (2d Cir. 2015); *see also Stassa v. Stassa*, 999 N.Y.S.2d 116, 119 (2d
Dep't 2014) ("The mere existence of a nonwaiver clause does not preclude waiver of a contract clause."). Here, because
under a standard waiver analysis Defendants have not waived their right to arbitration, the Court need not (and does
not) further analyze the 'no-wavier clauses' or the conditions under which they may themselves be waived.

protection.'" *Luitpold Pharms.*, 784 F.3d at 95 (quoting *Fundamental Portfolio Advisors*, 7 N.Y.3d at 104). "'[M]ere silence, oversight or thoughtlessness in failing to object' is insufficient to support an inference of waiver." *Id.* (quoting *Courtney–Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)). "While such a waiver may be express or implied, the intent to waive must be clearly established and cannot 'be inferred from doubtful or equivocal acts or language, and the burden of proof is on the person claiming the waiver of the right.'" *Lockheed Martin Transp. Sec. Sols. v. MTA Cap. Constr. Co.*, No. 09-cv-4077, 2014 WL 12560686, at *22 (S.D.N.Y. Sept. 16, 2014) (quoting *200 E. 87th St. Assocs. v. MTS, Inc.*, 793 F. Supp. 1237, 1251 (S.D.N.Y. 1992)) (internal quotation marks omitted). Waiver may be proven by "undisputed acts or language so inconsistent with [the party's] purpose to stand upon his [or her] rights as to leave no opportunity for a reasonable inference to the contrary." *Kamco Supply Corp. v. On the Right Track, LLC*, 49 N.Y.S. 3d 721, 726 (2d Dep't 2017) (internal citation and quotation marks omitted).

There is no dispute that Defendants never "expressly waive[d] the right to arbitrate." *Herrera*, 2022 WL 2819072, at *9. Instead, Plaintiffs argue that Defendants' participation in this litigation "manifests an affirmative acceptance of the judicial forum" that the Court should find demonstrates implied waiver because it is "inconsistent with a later claim that only the arbitral forum is satisfactory." Pls' Arb. Opp. at 13 (quoting *Stark v. Molod Spitz DeSantis & Stark, P.C.*, 9 N.Y.3d 59, 66–67 (2007)).

But Defendants' participation in litigation thus far is not sufficient to "evince [an] intent to abandon the right" to arbitrate. *Coggins*, 615 F. Supp. 2d at 30; *see also Highland CDO Opportunity Master Fund, L.P. v. Citibank, N. A.*, No. 12-cv-2827, 2013 WL 1191895, at *7 (S.D.N.Y. Mar. 22, 2013) ("[W]aiver is ultimately a matter of *intent*." (emphasis in original)). To be sure, Defendants could have—and perhaps should have—notified the Court sooner about their intent to compel arbitration of any potential class members who signed arbitration agreements. *See* Dkt. No. 162 at 2

(Defendant's July 5, 2021 letter, filed after conditional class certification and discovery, first raising the arbitration agreements). But there is at least a dispute of fact as to whether Plaintiffs were on notice earlier in this litigation that Defendants would seek to compel arbitration with any potential class or collective members who had signed arbitration agreements. *See* Dkt. No. 173 at 13:12–18 ("[I]t is the [D]efendants' position that [we] have raised the issue of arbitration with the [P]laintiff[s] in the past. . . . [I]t was raised at other times to [P]laintiff[s] throughout this litigation, including in discovery."). And whatever the communications during the initial stages of this litigation, crucially, Defendants "moved to compel arbitration" very close to "the earliest possible time." *Chen-Oster*, 449 F. Supp. 3d at 235. That is because "courts have repeatedly held that the earliest time to move to compel arbitration is after class certification." *Id.* at 234; *see also, e.g.*, *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) (a court cannot "compel absent putative class members who are not before this [c]ourt to binding arbitration or issue a ruling regarding the enforceability of the [arbitration] provision" before certification because "[a]ny such ruling is procedurally improper and analogous to an advisory opinion"); *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1238 (11th Cir. 2018) (noting that a motion to compel arbitration with respect to "unnamed class members prior to class certification" would be improper because it would have been "jurisdictionally impossible for the District Court to rule on those motions before the class was certified").

Here, Defendants first sought to use the arbitration agreements to limit the scope of class notices through the above-noted letter filed on July 5, 2021—a mere month-and-a-half after class certification. *See* Dkt. No. 139 (the Court's May 20, 2021 class certification order); Dkt. No. 162 at 2 (Defendants requesting a limitation on the class notice for those who had signed arbitration clauses). While that letter was not a formal motion to compel arbitration, it nonetheless evinced Defendants' intent to hold any Plaintiffs who had signed arbitration agreements to the terms of those agreements. In an October 7, 2021 oral opinion, the Court declined to limit the scope of class

notice as Defendants had requested.  Dkt. No. 173 at 17–20.  But it also noted that it intended to "put in place a process by which, to the extent that there is an arbitration provision with respect to any potential opt-in plaintiff, the issue can be brought to [the Court's] attention through standard motion practice with respect to that individual plaintiff." *Id.* at 18:3–7.  Then, shortly after the FLSA collective and Rule 23 class were finalized, Defendants notified the Court on March 9, 2022 of their intent to "file motions to dismiss some, or all, of [the parties and class members] for violations of the[ir] binding arbitration clause[s]" after they were provided a full list of individuals in the class action.  Dkt. No. 187 at 2.  Defendants gained that information on March 25, 2022.  Dkt. No. 193 ¶ 3.  After limited court-ordered discovery on the arbitration agreements, *see* Dkt. No. 189, Defendants sought leave to file their motion to compel arbitration on July 20, 2022.  Dkt. No. 197. And the Court granted that leave on August 10, 2022.  Dkt. No. 203.

Put simply, this course of conduct reflects that the Defendants sought to hold Plaintiffs to any relevant arbitration agreements at the earliest possible time, and thereafter moved to compel arbitration as soon as could reasonably be expected consistent with the Court's orders.  None of these actions could be said to "evince [an] intent to abandon the right" to arbitrate.  *Coggins*, 615 F. Supp. 2d at 30.  As a result, under the Second Circuit's contractual waiver analysis, Defendants did not waive their right to arbitrate with Plaintiffs who signed arbitration agreements.

### ii.  Modified Second Circuit Test for Waiver of Right to Arbitrate

Defendants also did not waive their right to arbitrate under the modified Second Circuit arbitration-waiver test.  After *Morgan*, the remaining elements of that test are "(1) the time elapsed from when litigation was commenced until the request for arbitration; and (2) the amount of litigation to date, including motion practice and discovery." *La. Stadium*, 626 F.3d at 159.

The first element—time elapsed from when litigation was commenced until the request for arbitration—weighs against a finding of waiver.  It is true that there was a large (roughly three-year)

gap between the time that litigation commenced to the request for arbitration.  But as discussed in more detail above, Defendants could not move to compel arbitration until after class certification. *See Chen-Oster*, 449 F. Supp. 3d at 234–35; *Jensen*, 372 F. Supp. 3d at 123; *Gutierrez*, 889 F.3d at 1238. And much of the reason that no class was certified sooner (and Defendants could not move to compel arbitration sooner) is that, because Plaintiffs did not file for conditional certification of the class, they did not move to certify the class until *after* discovery was complete in October 2020.  Dkt. No. 121 (Plaintiffs' motion to certify a class and collective); *see also* Dkt. No. 139 at 7 (the Court's order granting certification, which noted that Plaintiffs' decision to skip conditional certification was unusual).  In other words, roughly two years of the overall three-year gap between the filing of this case and Defendants' motion to compel arbitration can only be fairly attributed to Plaintiffs' conditional-certification decision.

Once the class was certified—again, as discussed in more detail above—Defendants moved to hold the relevant Plaintiffs to their arbitration agreements within a month-and-a-half.  And while additional time then passed before Defendants ultimately moved to compel arbitration, that time was the result of the Court's decisions (a) to have Defendants wait to file their motion to compel arbitration until after the list of class members had been finalized and the existence of arbitration agreements had been confirmed, and (b) to reopen discovery to allow the parties to exchange further information, including about the arbitration agreements themselves.  *See* Dkt. No. 173 at 19:19–21 (noting that while the Court would send notice to all prospective members of the collective and class action, "Defendants may still seek to compel arbitration and dismiss the claims of any plaintiffs with valid arbitration agreements who later join these actions"); Dkt. No. 189 (the Court's discovery order).

At most, therefore, approximately one-and-a-half months of delay in filing for arbitration can be fairly attributed to Defendants.  This is far less time than is needed to support a finding of

waiver.  *See, e.g.*, *In Re Generali Covid-10 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 294 (S.D.N.Y. 2021)

("Courts have found delays longer than a year—and certainly longer than five months—not to

constitute waiver."); *Manos v. Geissler*, 321 F. Supp. 2d 588, 595 (S.D.N.Y. 2004) ("The fact that

defendants let seventeen months elapse before filing their motion shortly before trial supports a

finding of waiver"); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995)

(finding waiver where a party delayed seven months and waited until "the eleventh hour, with trial

imminent" to seek enforcement of arbitration); *La. Stadium*, 626 F.3d at 159–60 (finding waiver

where plaintiff waited for eleven months to compel arbitration).  Viewed in the proper context, the

length of Defendants' delay thus weighs against a finding of waiver.

　　　The second element—the amount of litigation to date—also weighs against a finding of

waiver.  Assessing the litigation to date is designed to prevent litigants from "us[ing] arbitration as a

means of aborting a suit that did not proceed as planned in the District Court."  *La Stadium*, 626

F.3d at 161.  And in doing so, courts consider "any motion practice engaged in by the parties and

the extent of discovery the parties have exchanged."  *Pierre v. Rochdale Vill. Inc.*, No. 18-cv-6383, 2020

WL 6799635, at *7 (E.D.N.Y. Nov. 19, 2020) (collecting cases); *see also Safe Step Walk-In Tub Co. v.

CKH Indus., Inc.*, No. 15-cv-07543, 2019 WL 13181378, at *3 (S.D.N.Y. June 25, 2019) ("The

amount of litigation includes motion practice and discovery."); *Kingston*, 159 F.3d at 84 (commenting

that the amount of litigation includes consideration of "exchanges of pleadings and discovery").

　　　Plaintiffs note that there has been a significant amount of motion practice, and argue that

this element of the Second Circuit test should therefore weigh in favor of waiver.  Pls' Arb. Opp. at

15–16 (noting the "extensive and sustained discovery and motion practice" over the past four years).

But as with the timing of Defendants' motion to compel certification, more than a surface-level

examination of the docket is needed to properly assess whether the amount of litigation supports a

finding of waiver.  To the contrary, "context is key."  *Chen-Oster*, 449 F. Supp. 3d at 237.  And here,

that context shows that the motion practice that occurred before Defendants' motion to compel discovery does not signify that they have waived their right to arbitrate.

As in *Chen-Oster*, Defendants "could not compel arbitration until class certification and the members of the class were determined." *Id.* And as noted, it was Plaintiffs' decision to not move to certify a collective and a class until October 2020, until discovery had been completed. *See* Dkt. No. 139 at 7 ("Plaintiffs moved for certification of a collective action for the first time after discovery had already been conducted, skipping the first step of conditional certification.").[8] So Defendants' decision to engage in discovery and motion practice during that period does not suggest that they were using "arbitration as a means of aborting a suit that did not proceed as planned in the District Court," *La Stadium*, 626 F.3d at 161; to the contrary, it merely reflects the fact that they could not move to compel certification until the class was certified. *See Chen-Oster*, 449 F. Supp. 3d at 234–35; *Jensen*, 372 F. Supp. 3d at 123; *Gutierrez*, 889 F.3d at 1238. Any additional motion practice or discovery that occurred after class certification, moreover, largely reflected the Court's schedule in delaying Defendants' motion to compel arbitration until after the full list of class members was known and the decision to permit additional discovery concerning arbitration. *See* Dkt. No. 173 at 19:19–21; Dkt. No. 189.

Finally, Defendants seek to compel arbitration only as to a narrow subset of the class—the six individuals that are the subject of Defendants' motion. That means that, assuming there is no other reason why the class and collective actions should not proceed, "regardless of the outcome [as to the arbitration motion], this dispute will proceed in litigation." *Chen-Oster*, 449 F. Supp. 3d at 237. In other words, "the many motions, filings, discovery exchanged, and appearances would have occurred regardless of the size of the class and the absence of individuals who would have been in the class but for their agreement to arbitrate," which further militates against a finding of waiver. *Id.*

---

[8] As noted above, discovery would later be reopened for a limited purpose. *See* Dkt. No. 189.

In sum, Defendants have not evinced an intent to waive their right to arbitrate under either the Second Circuit's contract-waiver analysis or its modified arbitration-waiver analysis. So Defendants' motion to compel arbitration will be granted.

### C. Motion to Seal

On October 12, 2022, Defendants filed a motion to seal certain exhibits connected to their motion to compel arbitration. Dkt. No. 215. That motion will be granted.

There is a long-established "general presumption in favor of public access to judicial documents." *Collado v. City of New York*, 193 F. Supp. 3d 286, 288 (S.D.N.Y. 2016). The Second Circuit has defined "judicial documents" as documents filed with a court that are "'relevant to the performance of the judicial function and useful in the judicial process.'" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)); *see also Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 620–621 (S.D.N.Y. 2011). The presumption of access is "based on the need for federal courts to have a measure of accountability and for the public to have confidence in the administration of justice." *Amodeo*, 71 F.3d at 1048.

In *Mirlis v. Greer*, the Second Circuit summarized the three steps that the Court should follow to determine whether the presumption of public access attaches to a particular document and bars disclosure. 952 F.3d 51 (2d Cir. 2020). First, the Court determines whether the document is a "judicial document"—"one that has been placed before the court by the parties and that is relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 59 (internal quotation marks omitted). Second, the Court "proceeds to 'determine the weight of the presumption of access to that document.'" *Id.* (quoting *United States v. Erie Cnty.*, 763 F.3d 235, 239, 241 (2d Cir. 2014)). "The weight to be accorded is 'governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir.

1995)).  "Finally, the court must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access."  *Id.*

Here, the Court stops at step one because the relevant documents were never placed before the Court by the parties and thus were not relevant to the performance of its judicial function.  *See id.* at 59.  The motion to seal refers to the settlement agreements of Plaintiffs Natasha Lubrano and Chrismary Rodriguez.  Dkt. No. 215.  Place-holding filings for those exhibits (but not the agreements themselves) were filed Dkt. No. 208-1 and Dkt. No. 208-2.  As a result, the Court never reviewed these settlement agreements, and thus could not (and did not) rely on them for any judicial purpose.[9]  Instead, to determine that Ms. Lubrano and Ms. Rodriguez indeed entered the agreements, the Court relied on the (unrebutted) sworn declaration of Defendants' counsel Joshua M. Lurie.  *See* Dkt. No. 208 ¶¶ 5–7; *see also supra* n.7 (relying on Dkt. No. 208 as evidence of the settlement agreements and their terms).  As a result, the documents that are the subject of Defendants' motion to seal—the relevant settlement agreements—were never made relevant to the Court's performance of its judicial function or useful in the judicial process.  *Merlis*, 952 F.3d at 59.  So Defendants' motion to seal is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART,  Defendants' motion to compel arbitration is GRANTED, and Defendants' motion to seal is GRANTED.  Natasha Lubrano, Chrismary Rodriguez, Ariana Rivera, Cassandra Vermiul, Veronica Santiago, Kailyn Bayron, Charlene Jackson, and Elizabeth Vargas will be excluded from the class action.  Ms. Vargas will also be excluded from the FLSA collective action.  Mr. Lubrano and Ms.

---

[9] While the motion to seal makes reference to sending the settlement agreements to the Court by separate email, *see* Dkt. No. 215, the Court is unaware of any email having been sent; if one was sent, the Court did not review the agreements through this mechanism either.

Rodriguez's claims will be dismissed because they were previously settled.  *See* Dkt. No. 208 ¶¶ 5–7. The claims of Ms. Rivera, Ms. Vermiul, Ms. Santiago, Ms. Bayron, Ms. Jackson, and Ms. Vargas will be stayed pending arbitration.[10]

The Clerk of Court is directed to terminate the motions pending at Dkt. No. 206, Dkt. No. 209, and Dkt. No. 215.

SO ORDERED.

Dated:  July 21, 2023
        New York, New York

_____
GREGORY N. WOODS
United States District Judge

---

[10] While the parties do not address whether the claims of the parties for whom arbitration is compelled should be stayed or dismissed, the Court elects to stay those claims.  *See Katz v. Cellco P'Ship*, 794 F.3d 341, 345 (2d Cir. 2015) (noting that courts must stay—not dismiss—"claims [that] have been referred to arbitration" if a "stay [is] requested"); *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F. 4th 655, 664–65 (Jacobs, J., concurring) (arguing that "[p]roperly construed, the text of [FAA] Section 3 . . . requires a court that enforces [an arbitration clause] to stay proceedings in the interim" regardless of whether a stay is requested); *Chen-Oster*, 449 F. Supp. 3d at 274 (staying claims of class members who were excluded from a class action because of arbitration agreements).